[Civ. No. 10613.    Third Dist.    Mar. 19, 1964.]

HARDING W. ASPLUND, Plaintiff and Appellant, v. TED DRISKELL et al., Defendants, Cross-complainants and Appellants; JOHN BURNIP et al., Defendants, Cross-defendants and Respondents; INDUSTRIAL INDEMNITY COMPANY et al., Interveners and Appellants.

Edward T. McCarty for Plaintiff and Appellant.

Mento, Buchler & Littlefield, George K. Littlefield and Theodore H. Morrison for Defendants, Cross-complainants and Appellants.

Bradford, Cross, Dahl & Hefner and John Quincy Brown, Jr., for Interveners and Appellants.

Rich, Fuidge, Dawson & Marsh and Richard H. Fuidge for Defendants, Cross-defendants and Respondents.

PIERCE, P. J.—These appeals are from a plaintiff's judgment (after a jury trial) for personal injuries suffered. Plaintiff, a workman standing upon equipment 15 feet above the ground, was trying to disengage an A-frame line from, and engage a load line of a swing boom crane (a "cherry picker") onto the front end assembly of a forklift. While he was so employed, the boom line of the crane broke, striking plaintiff and throwing him to the ground. Serious injuries resulted. Plaintiff's successful theories of negligence were (1) defendant Driskell, the crane operator, employed by defendant Hood Construction Company (renter of the cherry picker), had abusively treated the boom line* in earlier field use of the crane; and (2) Driskell had negligently failed to observe the patently observable deterioration of the cable prior to the accident.[1]

Appellants' assignments of error are: (1) insufficiency of the evidence to support the jury's plaintiff verdict, (2) insufficiency of the evidence to support the jury's verdict absolv-

---

*Not to be confused with the load line.

[1]Recovery was against Hood, the renter of the crane and Driskell, its operator-employee, only. The cable manufacturer was granted a nonsuit and the owner of the crane, Bejac, was absolved from liability by the jury verdict. Plaintiff Asplund has appealed from the judgment in favor of Bejac but, since he urges such appeal only in the event of a reversal against Hood and Driskell (which we do not order), plaintiffs grounds of appeal need not be discussed in this opinion.

ing the owner of the crane, Bejac Construction Company, a copartnership, (3) misconduct of the trial judge during the jury's deliberations and (4) refusal by the trial judge to instruct on the effect of a safety order violation in connection with its possible application to a claim of contributory negligence. We disallow all these assignments and affirm the judgment.

Complexity of facts is only superficial. Once the numerous entities and individuals involved are identified and brought into correlation at the time and place of the accident, the facts are easily understood.

The accident happened on October 3, 1958, at or near the site of the Capehart Housing Project at Beale Air Force Base in Yuba County. Na Mar Builders, a subcontractor on that job, possessed an unassembled forklift in three separate pieces: the tractor, the front end assembly, and the fork. It desired to have this forklift assembled but did not have the lifting equipment necessary to do this. Stolte, Inc. (a contractor performing unrelated work at the base) had an A-frame mounted upon a truck. It loaned this equipment with its operator, Harding Asplund, the plaintiff, to assist in lifting the forklift's front end assembly so that it could be attached to the tractor portion.

This operation was commenced and partially accomplished. The cable of the A-frame was rigged to the top of the front end assembly and this line, powered by the truck's engine had successfully raised the front end assembly almost to a vertical position when the engine stalled and could not be restarted. Na Mar's representative then sought aid from Hood and received the offer to use its cherry picker (under rental from Bejac) and the help of Hood's operator, Driskell. The latter drove the crane to the point of the stalled operation.

Asplund shinned up the A-frame; then Driskell brought the cherry picker's boom in place so that its load line could be fastened to the top of the front end assembly of the forklift. Asplund then shackled the crane's load line to the assembly, centering it and keeping it choked so that it would not slide to one side. At Asplund's signal, Driskell brought the load line taut and then the front end assembly was lifted 3 or 4 inches off the ground. At this point "[T]he logging block on the A-frame started to tip over," and Asplund sought to disengage the line of the A-frame from the forklift assembly. He encountered difficulty in removing a pin which

would permit the block of the A-frame line to open up and disengage. He then signalled to Driskell "to boom-up," i.e., raise the boom to maneuver it into a position where disengagement of the A-frame line could be more easily accomplished. Apparently, it was during this operation that the boom cable of the cherry picker broke, causing the boom to drop, striking Asplund on the head. He fell to the ground. His injuries were serious.

The cherry picker, as stated above, was owned by Bejac. It had been rented by Hood and brought to the airbase three days before the accident.

The offending boom line was a 5/8-inch 8 x 25 cable. This means of a cable 5/8ths of an inch in diameter, composed of 8 woven strands of wire, each strand containing 25 filler wires. The 8 strands are woven around a hemp core. A 5/8-inch 8 x 25 cable is not the type specified for this crane by its manufacturer. Its manual calls for the use of a 5/8-inch 6 x 37 or 5/8-inch 6 x 19 cable.

The cable had been installed on this cherry picker two or three weeks prior to the accident. It was new when installed. Its selection was inadvertent. (Casual appearance of all these 5/8-inch wire cables is the same.) The crane, rigged with the cable, had been used by Bejac on another job for a couple of weeks before the crane had been delivered to Hood. When the cable was installed and again before its delivery to Hood, an inspection was made. Evidence produced by Bejac was that after the installation of the new cable the crane had been carefully operated at all times, and that when delivered the cable was undamaged.

Another 30-minute inspection of the 70-foot long cable was made by Hood's operator, Driskell, when the crane was received. This inspection included a running of the cable through the web of the operator's thumb and forefinger with his ungloved hand. Driskell found the cable in good condition.

Two witnesses, expert in their knowledge of cables, testified, one, Mr. Huntress, for plaintiff and the other, Mr. Von Geldern, for Bejac. They had had the advantage of being able to examine the cable in question, including the section at and in the area of the break.

Although these witnesses testified the 8 x 25 cable should not be used because of a greater susceptibility to crushing through an overwrapping or winding on the drum than a 6 x 37 or 6 x 19 line, they also stated the damage

found on this cable did not, in their opinion, result from such an overwrapping or overwinding.

The breaking strength of the 8 x 25 cable is not appreciably lower than a 6 x 19 or a 6 x 37 cable. (14.3 tons as against 16.7 or 15.8 tons, with the load here being only 4,300 pounds.) And from the testimony of these experts the jury reasonably could have drawn the conclusion that the weight of the load could not have caused the breaking of the cable. Since the experts had said damage from overwrapping was nonexistent, the jury reasonably could have concluded also that the fact that an 8 x 25 line was used was not a proximate cause in any respect.

Mr. Huntress testified the cable had been ''very severely weakened'' both at and near the break and that this damage was a result of field abuse. (The crane had been used by Hood for laying sections of pipe during the period of its rental.) Mr. Huntress also testified the damaged condition could have been caused by not more than eight hours of operation under conditions of abuse. ''It could happen very suddenly.''

Mr. Huntress thought the break probably occurred while the portion of the cable which gave way was either on the drum or on the sheave. Mr. Von Geldern disagreed. He found the cable had been damaged for a length of from 3 to 3½ feet in both directions from the point of break and it was his opinion the rigging was such that the damaged portion of the cable had never been on the boom drum at all; ''it never actually wound around the drum at any time.''

Counsel for appellants Hood and Driskell, in a closing brief on appeal, have made calculations from which a deduction is drawn the break must have been at a point on the cable where it was wound on the drum; that Driskell's observation during the crane's operation could not possibly have disclosed the damaged condition of the cable prior to the break. We cannot give to appellants' computations that infallibility. Mr. Von Geldern's computations brought a contrary conclusion and Mr. Huntress had testified: ''Q. And assuming the damage to the cable to be as it appears on this exhibit, would you say that in your opinion an operator sitting on the seat could have seen the damaged line running through the shiv [sic] ahead of him, if he had looked? A. I think so, yes.''

We must assess the opinions of these experts as substantial evidence. We conclude, therefore, that the evi-

dence discussed above, justified the jury in finding (1) that operation of the crane while in Hood's control (whether by Driskell or another operator) resulted in "field abuse" of the cable which severely damaged it and caused it to break, (2) that the operator Driskell was negligent in failing to observe a patently observable damaged condition of the cable before it broke, and (3) that Bejac's use of an 8 x 25 cable, although not the type specified by the crane's manufacturer, was not a proximate cause of the accident.

Appellants' contentions of misconduct by the trial judge during the deliberations of the jury are based upon incidents where the jury requested the reading of certain testimony and the rereading of certain instructions. These contentions can best be discussed with a background of the principles of law upon which they rest.

California Code of Civil Procedure section 614 provides that after the jury has retired for deliberations, its members, if in disagreement as to any part of the testimony, or if they desire information on any point of law, may be brought before the court (with counsel present) and the information required must be given.

The requirements of this section, phrased in mandatory language, must be strictly complied with. (*Smith* v. *Shankman*, 2J8 Cal.App.2d 177, 182 [25 Cal.Rptr. 195].) It has been held that when a jury has requested a rereading of all instructions on negligence it must be assumed the jury had either failed to recollect their full import or were in disagreement as to those actually given; and that a case must be reversed for an inadvertent failure by the court to include all of such instructions even though an attempt had been made to do so. (*Davis* v. *Erickson*, 53 Cal.2d 860 [3 Cal.Rptr. 567, 350 P.2d 535].) In *Halada* v. *Venice Lake Park, Inc.*, 132 Cal.App.2d 788 [283 P.2d 42], it was held to be prejudicial error for the judge to refuse to have requested evidence read. And in *James* v. *Key System Transit Lines*, 125 Cal.App.2d 278 [270 P.2d 116], the appellate court held it was error not to read the portions of a deposition (the jury having requested delivery of the deposition itself) but that the error is not prejudicial where the deposition, the plaintiff's, does not impeach his testimony.

In the case before us, after the jury had deliberated for approximately four hours, it returned to the court and through its foreman asked that that portion of Driskell's testimony covering the crane operation just before, during

and after the accident be read. A substitute reporter had reported that portion of the trial. He was not then available. Other testimony requested was read to the jury. A search was then made for the missing reporter, but he still could not be found. Later that evening, the judge had the jury returned to the courtroom. The circumstances were explained and the judge asked: "Mr. Foreman, do you feel from your discussions that it is possible that you might resolve this problem by further discussion amongst yourselves as to the testimony?" The foreman replied he thought it was possible. The request for the reading of the testimony was not renewed.

Noncompliance with the jury's original request was not error. The court had not refused the jury's request. In fact it had taken particular pains to attempt to comply with it (even by soliciting the aid of the California Highway Patrol). Furthermore, the request never was denied. The inference from the judge's whole statement is clear that if the jury pressed its desire or need to hear the evidence read, the search for the missing court reporter would be continued. Ultimately, of course, he would have been located. The jury elected to abandon the request.

In *Smith* v. *Shankman, supra,* 208 Cal.App.2d 177, the bailiff advised the jury it could not have a transcript of a doctor's testimony. This information literally true was nevertheless misleading. The jury should have been told of its right to have the testimony read. The judge, however, having learned of the bailiff's conduct, had the jury brought before the court. The jury by then had reached a verdict, but the judge, before receiving it, informed the jurors of their right to have any portion of the evidence read and asked them if they desired a reading of any part of the transcript. The foreman replied that the jury had been able to reach a verdict without it. It was held the bailiff's misconduct did not result in prejudice sufficient to justify a reversal. (The case was reversed for erroneous instructions. See, also, *People* v. *Warren,* 130 Cal. 678 [63 P. 87].)

Late in the evening, after the jury had asked a re-reading of certain instructions (hereinafter to be discussed), the foreman asked: "Now, we would like to have some testimony, Mr. Huntress, in regards to the 8 by 25 cable lifting the load and if this cable should be used safely on this crane."

Counsel for appellants then sought to have selected por-

tions of the Huntress testimony which *he* had had transcribed read in partial compliance with this request. The court, however, stated: "THE COURT: We will just let Mr. Jones [the court reporter] read it. MR. LITTLEFIELD: I thought it might help him. THE COURT: Consider ourselves fortunate that we have the reporter."

The reporter then read the portions of the transcript which were deemed to comply with the jury's request.

Appellant's counsel requested that other portions be read and this was done. This touched off a request by Bejac's counsel, "I will ask that Huntress' testimony be read in which he says this is not a cause of injury," and appellants' counsel then stated: "I would also like to have read—" at which point the court, observing where this colloquy between counsel was carrying the proceedings, interrupted: "If you start that, we will be here all night. *I am going to have to let the jury decide when they have got the information they asked for.*" (Italics supplied.)

He then invited them to retire again to the jury room to discuss with their foreman any further information required. Before their retirement the foreman asked for the rereading of further testimony from another witness. The jury then did retire and did not return until a verdict had been reached.

Appellants assign as error the court's refusal to comply with their counsel's request for testimony reading. It was not. ■ It is not the party to whom the law gives the right to *select* testimony to be read. And the law does not make the party or his attorney the arbiter to determine the jury's wishes. We have at least a suspicion that what was sought here was not a reading of the testimony the jury had requested but of what counsel wanted them to hear. Any trial-tested jurist (or lawyer) is well aware of the jockeying between counsel which commonly attends a jury's request, whether for reread instructions or testimony; particularly when the request has been somewhat inarticulately expressed by a jury foreman. The judge here wisely restricted clarification to the jury itself and rejected counsel's "help."

■ The jury, returning to the courtroom at 11:53 p.m., made the following request: "Judge, your Honor, they would like to have some of your instructions, Actor One and Actor Two, findings of negligence on part of defendants. THE COURT: Come again with that, Mr. Pease? THE FOREMAN: They want some of your instructions on finding of negligence on parts of defendants, that you read in your instructions.

(Pause) THE COURT: I am not going to reread all of the general instructions. This isn't what you want, is it? THE FOREMAN: No." The court then construed the request as stated to have referred to instructions regarding the effect of the conduct of two or more persons acting independently and at different times on the question of negligence and proximate cause, and reread BAJI Instructions No. 104-C.1 (which refers to the "original actor" and the "secondary actor") and No. 53. Neither the jury foreman nor any member of the jury expressed dissatisfaction with the court's interpretation of the request. We think the interpretation was accurate.

After the instructions referred to had been read counsel requested: "In view of the request by the foreman, I would like to have read the instructions as to the basic rule of negligence, the duty and care and foreseeability which were read originally by the Court, in view of the request made." The request was properly refused. Fairly construed, the jury's request had not included the instructions requested by counsel.

Appellants' last contention requiring notice by this court is that it was error to refuse an instruction stating the provisions of section 4001 of title 8, California Administrative Code. These provisions are: "No employee shall be required to or shall ride on loads, ... except under conditions or exceptions covered by other orders of the division." Appellants wished to have this read, coupled with an instruction that the jury could find a violation of the safety order to be contributory negligence barring recovery. Appellants argue: "Clearly there were facts from which the jury could find that the plaintiff violated the order." Assume this; but appellants do *not* make clear that the violation of this safety order could have been a factor of causation.

The evidence was unclear as to whether at the time he was struck plaintiff was standing altogether on the top rung of the A-frame, or partly thereon and partly on the top of the front end assembly of the forklift; or possibly both feet were on said assembly. This front end assembly, as we have shown, was the "load" suspended on the cherry picker's load line and which at the time of the accident had been lifted 3 or 4 inches from the ground.

But whether his feet were in one position or another, and whether the front end assembly was several inches off the ground or still on the ground, it is quite obvious that none of these matters were circumstances which had any part in the

breaking of the cable or the dropping of the boom onto Asplund's head. These were not factors of causation.

The negligence which bars recovery is *contributory* negligence; that which "contributes" as one of the proximate causes of the accident. Negligence unrelated to the cause or causes of the accident is not a bar.

It is stated in Prosser on Torts (2d ed.) at page 286: "... In a leading Connecticut case [*Smithwick* v. *Hall & Upson Co.*, 59 Conn. 261 (21 A. 924, 21 Am.St.Rep. 104, 12 L.R.A. 279)] in which a workman violated instructions not to work on the unguarded end of a slippery platform, and was injured by the fall of a brick wall, it was held that he might recover, since his negligence did not extend to such a risk. Upon the same basis, it has been held that a passenger riding upon the platform of a street car is not negligent with respect to a collision, nor is an automobile driver who parks near a fire hydrant negligent as to any vehicle which may drive into him, except a fire engine, nor is one who drives at excessive speed negligent as to a tree which falls on him."

We accept this as sound law.

Moreover, even if it should be asserted—and we think it would be ridiculous to assert it here—that a jury reasonably might have concluded that Asplund's weight, added to the 4,300-pound equipment being lifted, was the straw breaking the camel's back and thus had had a causal connection with the accident, it still would not be a bar to recovery.

When the Division of Industrial Safety proscribed "riding" on a crane's load the remote possibility that a boom cable (not the load line) would break, causing the dropping boom to hit a workman on the head, was not the type of risk it contemplated; and therefore a violation of the safety order, even if there was one, would not bar recovery. (*Nunneley* v. *Edgar Hotel*, 36 Cal.2d 493, 497 [225 P.2d 497]; Rest., Torts, § 286, comment on clause c.)

As stated by Dean Prosser (*op. cit.*, p. 286): "... [T]he plaintiff's failure to exercise reasonable care for his own safety does not bar his recovery unless his injury results from the particular risk to which his conduct has exposed him . . . .

". . . What is meant is that the plaintiff's conduct has not exposed him to any foreseeable risk of the particular injury through the defendant's negligence, and therefore is not available as a defense."

These rules apply under the facts here. And since they dispose of appellants' contention we find it unnecessary to answer the further question as to whether this safety order, which was certainly designed primarily for the protection of workmen, could ever be said also intended to act as a boomerang to bar them from recovery. This proposition, as applied to any view of the facts conceivable here, we regard with considerable dubiety. (And see *Lokey* v. *Pine Mountain Lbr. Co.*, 205 Cal.App.2d 522, 527-528 [23 Cal.Rptr. 293] ; *Mason* v. *Case*, 220 Cal.App.2d 170, 180-181 [33 Cal.Rptr. 710].)

The judgment is in all respects affirmed. Asplund, Industrial Indemnity Company, Stolte, Inc., and Bejac Construction Company shall recover costs against Driskell and Hood Construction Company.

Schottky, J., and Friedman, J., concurred.

A petition for a rehearing was denied April 16, 1964, and the petition of the defendants and appellants for a hearing by the Supreme Court was denied May 13, 1964.